IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARDNER, | No. C04-05444 MJJ |
| Plaintiff, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| KANE ET AL, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Petitioner Darryl T. Gardner's ("Petitioner") petition for writ of habeas corpus ("Petition"), filed pursuant to 28 U.S.C. § 2254. Petitioner alleges that the California Board of Parole Hearings[1] ("Board") violated his federal due process rights when, at an August 22, 2002 parole hearing, the Board found him unsuitable for parole for the sixth time. For the following reasons, the Court **DENIES** the petition for writ of habeas corpus.

## BACKGROUND

**A.    The Commitment Offense[2]**

On the afternoon of May 2, 1982, 29 year-old Joseph Bryant ("Bryant") sat in his automobile in Pasadena, California. Petitioner, armed with a gun, approached Bryant's automobile. According

---

[1] The Board of Parole Hearings was formerly named the Board of Prison Terms. *See* Cal. Pen. Code § 5075.

[2] This description of the commitment offense is from Respondent's Answer and Petitioner's Traverse, which rely on the Statement of Facts from the state court appellate decision.

to witness reports, Bryant put his hand out of the car window and began waiving as if to stop Petitioner's approach. Petitioner continued to approach the car, aimed his gun at Bryant's head, and fired a single shot at Bryant. The bullet hit Bryant in the neck and killed him instantly. Upon hearing the gun shot, the witnesses ran. Petitioner chased one of the witnesses down. That witness testified that Petitioner pointed a gun at him and inquired, "[w]hat did you see?" (Resp., Ex. 3 at 16-17.) The witness told Petitioner that he had not seen anything and implored Petitioner not to shoot him. Petitioner then fled the scene.

When the police arrived, they found a fully loaded .25 caliber automatic handgun between Bryant's legs and his buttox. The handle of the handgun was exposed. They also found live shells in the left front pocket of Bryant's pants. However, the police later determined that Bryant did not discharge the .25 caliber. They also determined that Bryant was killed by a bullet from a .44 magnum, shot at close range.

Upon further investigation, the police produced a license plate number of a vehicle that Petitioner drove. They traced the license plate number to the registered owner, searched the vehicle pursuant to a valid search warrant, and uncovered a .44 magnum holder, a white knit stocking cap, a black carrying bag that contained a loaded Ross I 12-gauge sawed-off shotgun wrapped in a towel and live ammunition for both weapons.

On June 21, 1983, a jury in the Los Angeles Superior Court found Petitioner guilty of second-degree murder of Bryant. On August 5, 1983, the trial court sentenced Petitioner to a term of fifteen years to life in state prison, plus a consecutive term of two years for use of a firearm. He is currently incarcerated in Soledad, California.

**B.     August 22, 2002 Parole Proceedings**

On August 22, 2002, Petitioner received his sixth parole hearing. Both Petitioner and his attorney were present and given an opportunity to speak. The Board first discussed the commitment offense with Petitioner, relying on the Statement of Facts in the appellate decision. Petitioner had no objection to the Board's use of this version of the commitment offense. Petitioner also agreed that the Board could use the version of the offense that he gave in October 2000. The Board noted that Petitioner "expressed what appeared to be sincere remorse for the taking of Joseph Bryant's life and

1  perpetuating the silent [] cycle of ethnically-based crime." (Resp., Exh. 3 at 18.)

2        The Board then discussed Petitioner's pre-offense background.  Petitioner had "a nolo
3  contendre, an ADW in '75, a 496 conviction in '75," "an arrest for armed robbery, but convict[ion]
4  [for] carrying a weapon in a vehicle in '75.  Grand theft in '77," and "reckless driving in '78."
5  (Resp., Exh. 3 at 18-19.)  The Board pointed out that prior offenses resulted in probation or jail time,
6  but that Petitioner had not previously served a prison term.

7        Next, the Board moved to Petitioner's social history.  They noted that his parents divorced
8  when he was one year old, he had been arrested for burglaries as a juvenile, he was declared
9  "incorrigible" at age 15, and Petitioner once gave an alias to an officer that pulled him over while he
10 was driving.  (Resp., Exh. 3 at 20.)   Petitioner also admitted that in high school he drank alcohol
11 and tried some drugs "on a recreational level" due to "peer pressure," but said he was never an
12 addict.  (Resp., Exh. 3 at 21-22.)

13       Finally, the Board went over Petitioner's post-conviction record.  Petitioner participated in
14 many productive endeavors while in prison.  The Board observed that, in the past, Petitioner worked
15 with mentally ill inmates and, according to reports, did an "exceptional" job.  (Resp., Exh. 3 at 28.).
16 He acquired optical and dry-cleaning skills.  In 1987, he received an A.A. degree, and in 1989 he
17 earned his B.A. from San Jose State.  Most recently, Petitioner began a Vocational Data processing
18 (Information Technology) program.  The last work report he received said his work was
19 "satisfactory."  (Resp., Exh. 3 at 27.)  The Board discussed that Petitioner dropped out of Alcoholics
20 Anonymous and Narcotics Anonymous after five years because he was "disillusioned" with the
21 programs.  Instead, he began to take Islamic classes and became an active participant in the Islamic
22 community.  Additionally, he has been a charter member of the Higher Ground Program since 1995,
23 which is a program that addresses at-risk youth in the community.  The Board also reviewed the fact
24 that Petitioner was once in group therapy for substance abuse, but no longer participated in any such
25 program.

26       Despite some of his progress, Petitioner has also had some minor set-backs.  Although he had
27 not received any serious disciplinary reports while in prison (CDC 115s), he received eleven
28 counseling memoranda for lesser infractions such as "abuse of phone privileges, disobeying orders

1  [and] responsibility for count." (Resp. Exh. 3 at 33.) His most recent such counseling memoranda
2  was issued in 1996.[3]

3  Then, the Board read from two reports, the first of which was a psychological examination
4  from Dr. Livingston in 2002. Dr. Livingston rated Petitioner's risk for societal violence and
5  concluded that Petitioner was "at a high level for historical items and a low level for present and
6  future items." (Resp., Exh. 5.) He placed Petitioner in the moderate range for risk of violence
7  within the next ten years. On the other hand, the second report was from Petitioner's Correctional
8  Counselor, who considered "the commitment offense, prior record, and prison adjustment" and
9  reported that Petitioner would pose a low threat risk to the public if he were to be released from
10 prison. (Resp., Exh. 6.)

11 Lastly, the Board reviewed Petitioner's parole plans. Petitioner indicated that he had
12 multiple employment offers, but that he would prefer to work for his uncle in Los Angeles at an
13 income tax and property management service.

14 At the end of the hearing, a representative spoke on behalf of the Los Angeles County
15 District Attorney's office, stating that the District Attorney was opposed to a suitability finding
16 because Petitioner posed an unreasonable risk of danger to others. The District Attorney's office
17 based this determination on the circumstances of the crime, and on Petitioner's history of crime.
18 Petitioner's attorney also spoke, calling the Board's attention to the fact that Petitioner only shot at
19 the victim once, and that Petitioner was fearful during the crime because Bryant was also carrying a
20 fully loaded gun. He stated that most of Petitioner's crimes prior to the commitment offense were
21 property offenses.

22 Ultimately, the Board denied Petitioner's parole for one year. It concluded that Petitioner
23 was "not suitable for parole and would pose an unreasonable risk of danger to society and a threat to
24 public safety if released from prison" because "[the] offense was carried out in a manner which
25 demonstrates an exceptionally callous disregard for human suffering." (Resp., Exh. 3 at 56.)
26 Further, the Board found that Petitioner's "previous record is one of escalating conduct," and that he
27
28    [3] There is a more recent memorandum in Petitioner's file from 2002 for an infraction involving the length of his facial hair, but the Board disregarded it because Petitioner had a legitimate doctor's excuse for the growth.

4

1  "failed to profit from attempts by society to correct his criminality" prior to the commitment
2  offense." (Resp., Exh. 3 at 57.)  Finally, the Board stated that Petitioner has "not yet fully
3  participated in beneficial self-help and therapy programming," "to face, discuss and understand the
4  causative factors that led to the life crime and to explore his culpability in his life crime, along with
5  coping with stress in a non-destructive manner." (Resp., Exh. 3 at 59.)  Despite the denial of parole,
6  the Board commended Petitioner for his good behavior and positive programming.  The Board
7  recommended that he remain disciplinary free, continue to participate in self-help programming
8  when available, and complete the vocation in data processing.  The Board concluded that Petitioner
9  was "well on [his] way," and that he was doing "excellent work." (Resp., Exh. 3 at 60.)

## PROCEDURAL BACKGROUND

The Los Angeles County Superior Court denied Petitioner's original writ for habeas corpus in May 2004, and the California Supreme Court denied the petition for review in August 2004. Respondent concedes that Petitioner has exhausted the administrative and state court remedies regarding the federal due process claim. For the purposes of 28 U.S.C. § 2254(d), the last "reasoned [state court] decision" is the August 11, 2004 Los Angeles Superior Court Order, in which the court denied the petition on the grounds that Petitioner "failed to show a prima facie case for relief." (Resp., Exh. 7 at Exh. C.) *See LaJoie v. Thompson*, 217 F. 3d 663, 669 n.7 (9th Cir. 2000) (in determining whether the state court's decision is contrary to, or involved in an unreasonable application of, clearly established federal law, a federal court should look to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision).

Petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 on the grounds that the Board violated his federal due process rights when, at the August 22, 2002 parole hearing, the Board found him unsuitable for parole for the sixth time. This Court ordered Respondent to show cause why the petition should not be granted on the basis of Petitioner's claim. Respondent Anthony Kane ("Respondent") moved to dismiss this petition for lack of subject matter jurisdiction on the ground that there is no federally protected liberty interest in parole under California's statutory parole scheme. This Court denied Respondent's motion to dismiss. Respondent filed an answer, accompanied with memorandum and exhibits. Petitioner filed a traverse.

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgement of a State court only on the ground that he is in custody in violation of the Constitution or the laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to habeas review of a state court decision upholding a parole board's denial of parole. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006). Under AEDPA, this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice v. Collins*, 546 U.S. 333 (2006).

6

**ANALYSIS**

**A.    The "Some Evidence" Standard Applies.**

Petitioner urges this Court to find that the "some evidence" standard is inapplicable to a federal court's review of a parole board's decision. However, the Ninth Circuit has confirmed the use of the "some evidence" standard in the parole context. *See Sass*, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)); *Irons v. Carey*, 479 F.3d 658 (9th Cir. 2007). The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. *See Hill*, 472 U.S. at 455. An examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence. *Id.* The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board. *See id.* Additionally, the evidence underlying the Board's decision must have some indicia of reliability. *See McQuillion v. Duncan*, 306 F.3d 895, 904 (9th Cir. 2002).[4]

**B.    The Board's Decision Was Based on "Some Evidence."**

Petitioner argues that the Board's denial of parole violated his due process rights because the decision finding him unsuitable was unsupported by evidence. The Court disagrees.

When courts assess whether a state parole board's suitability determination is supported by "some evidence" in a habeas case, the analysis is framed by state law. California Code of Regulations, title 15, section 2402(a) states that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time serviced, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

---

[4] In arguing against the "some evidence" standard, Petitioner contends that, under California law, the Board must make each of its findings of unsuitability under a "good cause" standard that requires a "preponderance of the evidence" on each issue considered. (Traverse at 3-4.) This is not an accurate statement of California law. The Board is simply required to ***consider*** "all relevant, reliable, information." 15 Cal. Code Regs. § 2402(b); *see also Rosenkrantz*, 29 Cal. 4th at 653 ("[a]ll that is required is "an individualized consideration of all other factors relevant to parole suitability."); *In re Scott*, 133 Cal. App. 4th 573, 590 (2005) ("As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.") Here, the record unambiguously reflects that the Board went over all relevant factors in an extremely thorough manner. As the Board's consideration of the evidence as a whole did not violate this aspect of state law, it certainly did not violate any state law interest that might be protected by federal due process.

United States District Court
For the Northern District of California

1   an unreasonable risk of danger to society of released from prison." The regulations direct the Board
2   to consider "all relevant, reliable information available," as well as "any other information which
3   bears on the prisoners suitability for release." 15 Cal. Code Regs. § 2402(b); *see also Martin v.*
4   *Marshall*, 431 F. Supp. 2d 1038, 1045 (N.D. Cal. 2006). Further, the regulations list circumstances
5   tending to indicate whether or not an inmate is suitable for parole. 15 Cal. Code Regs. § 2402(c)-
6   (d).[5] However, these circumstances are meant to serve as "general guidelines," giving the Board
7   latitude to weigh the importance of the combination of factors present in each case. 15 Cal. Code
8   Regs. § 2404(c). Thus, the Board enjoys broad discretion in parole-related decisions. *See In Re*
9   *Powell*, 45 Cal. 3d 894, 902 (1988). The California Supreme Court has found that the foregoing
10  statutory scheme places individual suitability for parole above a prisoner's expectancy in early
11  setting of a fixed date designed to ensure term uniformity. *See In re Dannenberg*, 34 Cal.4th 1061,
12  1070-71 (2005). In sum, "the Board, exercising its traditional broad discretion, may protect public
13  safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's
14  crime individually." *Id.* at 1071.

15  Here, the Board found that Petitioner was "not suitable for parole and would pose an
16  unreasonable risk of danger to society and a threat to public safety if released from prison" because
17  "[the] offense was carried out in a manner which demonstrates an exceptionally callous disregard for
18  human suffering;" Petitioner's "previous record is one of escalating conduct;" and Petitioner has
19  "not yet fully participated in beneficial self-help and therapy programming." This Court finds that
20  there is "some evidence" to support the Board's finding of Petitioner's unsuitability for release on
21  parole.

22  ///
23  ///
24

---

25  [5] The circumstances tending to show an inmate's unsuitability are: (1) the commitment offense was committed in
26  an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as "lengthy history of severe mental problems related to the offense;" and (6)
27  prison misconduct. 15 Cal. Code Regs. § 2402(c). The circumstances tending to show an inmates suitability are: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress
28  which built up over time; (5) Battered Woman's Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law. 15 Cal.Code Regs. § 2402(d).

8

///

///

**1.      The Board's Findings Regarding The Commitment Offense Were Supported By Some Evidence.**

The Board can consider the gravity of the commitment offense in assessing an inmate's suitability for parole. Cal. Penal Code § 3041(b); *see* 15 Cal. Code of Regs § 2492(c)(1).[6] Here, the Board found that Petitioner carried out the commitment offense in a "cruel manner" "which demonstrates an exceptionally callous disregard for human suffering." *See* 15 Cal. Code. Regs. § 2402(c)(1), (1)(B). Petitioner contends that the crime was not particularly callous or cruel because it was a single incident that involved a single victim. He also alleges that he committed the crime out of fear for his own life, because he knew that Bryant had a fully loaded firearm. However, based on the circumstances of the crime involving an unprovoked shooting of a victim who was sitting in his own car, as well as an armed confrontation with a witness immediately afterwards, the Board had at least some evidence, beyond the minimum conduct required for second degree murder, to support its findings regarding this crime. The Board noted that for no apparent reason, Petitioner shot Bryant at close range while Bryant was sitting in his car.[7] Although there was a weapon found between Bryant's legs and underneath his buttocks, witnesses saw Bryant waiving his hand out of the window, as if trying to get Petitioner to go away.[8] After the shooting, the Petitioner also chased one of the witnesses down, pointed a gun at him, and inquired, "[w]hat did you see?" (Resp., Ex. 3 at 16-17.) This Court finds that the Board's determination that the crime was "cruel," "callous" and "dispassionate" is supported by "some evidence."

---

[6] The factors that tend to show the commitment offense was committed in an especially heinous, atrocious or cruel manner are: (1) multiple victims were attacked, injured or killed in the same or separate incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled or mutilated during or after the offense; (4) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; or the motive for the crime is inexplicable or very trivial in relation to the offense. 15 Cal. Code Regs.§ 2402(c)(1)(A)-(E).

[7] The triviality or inexplicability of a motive for a crime comprises evidence beyond the minimal elements of a second degree murder within the meaning of California parole law, 15 Cal. Code Regs. § 2402(c)(1)(E), and can comprise "some evidence" to deny parole by reflecting that petitioner posed an unreasonable risk of present danger to society if released. *See Irons*, 505 F.3d at 852-53.

[8] Petitioner relies heavily on *In re Shaputis* in support of his argument that his crime was not "exceptionally callous." 135 Cal. App. 4th 217 (4th Cir. 2005). However, *Shaputis* has been ordered depublished and may not be cited to establish California law. *See* Cal. Rules of Court, Rules 8.1105, 8.1115 and 8.1125.

9

1  ///

2  ///

### 2. The Board's Findings Regarding Petitioner's Pre-Commitment Factors Were Supported By Some Evidence.

The Board also based its denial of parole on the basis that Petitioner's pre-commitment record was one that demonstrated an "escalating pattern of criminal conduct." Petitioner concedes that "his record prior to the commitment offense was extensive and sometimes violent." (Traverse at 11:17-19.)

One of the factors tending to show suitability is "no juvenile record." 15 Cal. Code Regs § 2402(c)-(d). The Board found that Petitioner had "some problems as a juvenile, where he was beyond control and had some burglaries." At the age of fifteen, Petitioner had already been deemed "incorrigible." Additionally, one of the factors tending to show unsuitability for parole is if Petitioner has a "previous record of violence." As an adult, Petitioner committed many crimes, including "exhibiting a deadly weapon, receiving stolen property, forgery, carr[ying] a concealed weapon, grand theft property [and] robbery." The Board took special notice of the fact that just weeks before killing Bryant, Petitioner committed an especially gruesome home invasion robbery, where he hog-tied a female victim. While Petitioner served both probation and county jail time for these crimes, the Board indicated that he "failed to profit from those attempts by society to correct his criminality," evidenced by the fact that he continued to commit crimes up until the current commitment offense. Thus, there is clearly "some evidence" to support the Board's finding that Petitioner had a "previous record of violence" and an "escalating pattern of criminal conduct."

### 3. The Board's Finding That Petitioner Needed Further Self-Help And Therapy Based On Post-Commitment Factors Was Not Supported By Some Evidence.

The Board also based its finding of unsuitability in part on the fact that it believed that Petitioner has not yet "fully participated in beneficial self-help and therapy programming," and that Petitioner "need[s] self-help programming in order to face, discuss and understand the causative factors that led to the life crime and to explore his culpability in his life crime, along with coping

10

1 [with] stress in a non-destructive manner." The Board concluded that "until progress is made
2 [Petitioner] continues to be unpredictable and a threat to others."[9]

3       The Court finds that the Board lacked even "some evidence" to support these findings
4 regarding post-commitment factors. The evidence before the Board undisputedly indicated that
5 Petitioner's progress in therapy was exemplary, including that he had taken a vocational data
6 processing course, become certified in vocational dry cleaning, had obtained experience as an
7 optical lab technician, tutored mentally ill inmates, earned a B.A. degree, received positive work
8 supervisors' reports, participated steadily in the Higher Ground Program for troubled youth in the
9 community, completed therapy, and participated in AA and NA for several years. Petition had
10 several memoranda commending his conduct, work, and reform. (Resp. Exhs. 3 at pp. 27-33 & 6 at
11 pp. 3-4.) The Board offered no explanation tethered to the record before it, beyond the "mouthing of
12 conclusionary words," as to how any post-commitment factors indicated that Petitioner needed
13 further self-help programming or continued to be unpredictable and a threat to others. *See In re*
14 *Scott*, 119 Cal. App. 4th 871, 897 (2004); *In re Ramirez*, 94 Cal. App. 4th 549, 571 (2001). The only
15 post-conviction factors relied upon by the panel in support of this conclusion was the observation
16 that he had eleven counseling chronos (Resp., Exh. 3 at 58:6), but the last of these was received by
17 Petitioner in 1996 and none involved serious circumstances.[10] All other aspects of the post-
18 commitment record indicated that Petitioner had been disciplinary free, that his in-custody
19 performance had been outstanding, and that he had gained insight into his commitment offense.
20 Petitioner's counseling chronos, especially in contrast with his otherwise positive incarceration
21 record discussed at the hearing, simply provide no reliable, post-commitment evidentiary support for
22 the Board's findings that Petitioner still needed further self-help programming in order to face,
23 discuss and understand the causative factors that led to the life crime and to explore his culpability.

---

[9] In assessing a petitioner's suitability for parole, the Board can rely on psychological factors such as the prisoner's "past and present mental state," 15 Cal. Code Regs. § 2402(b); whether the prisoner has a "lengthy history of severe mental problems related to the offense," 15 Cal. Code Regs. § 2402(c)(5); and whether the prisoner indicates that he "understands the nature and magnitude of the offense." 15 Cal. Code Regs. § 2402(d)(3).

[10] The Court agrees with Petitioner that Dr. Livingston's mental health evaluation does not provide sufficient evidence of ***post-commitment*** factors that would render him unsuitable for parole. Although Dr. Livingston's ultimate conclusion was that Petitioner would pose a moderate risk of violence to the community in the next ten years if released, his report indicated that this result was combination of high risk factors for historical items and low risk for present and future items. (Resp., Exh. 5.)

11

### 4. No Clearly-Established Federal Law Prevents The Board From Denying Parole Based Solely On Unchanging, Historical Factors In These Circumstances.

In light of the above discussion, the Court concludes that two of the three bases for the Board's decision to deny parole were supported by some evidence. However, Petitioner contends that a denial of parole based solely on pre-commitment factors is a denial of due process because, due to their unchanging nature, it essentially equates to interminably denying him parole. In support of this proposition, Petitioner relies on a series of Ninth Circuit cases that have raised the concern that a continued reliance by a parole board on unchanging factors runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

In *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003), the Ninth Circuit first recognized in dicta that a continued reliance on an unchanging factor such as the circumstances of the offense in denying parole "could", at some point, result in a due process violation. *See id.* at 916-17. That dicta has subsequently been acknowledged by the Ninth Circuit as the apparent law of the circuit. *See Sass*, 461 F.3d at 1129*; Irons*, 505 F.3d at 853; *Hayward v. Marshall*, 512 F.3d 536, 545 (9th Cir. 2008).

While the court in *Biggs* rejected several of the reasons given by the Board for finding the petitioner unsuitable for parole, it upheld three: (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy. *Biggs*, 334 F.3d at 913. However, the court cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to that offense in denying parole could violate due process. *Biggs* observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest in parole.

*Id.* at 916.

12

///

In *Sass*, the Board had found the petitioner unsuitable for parole at his third suitability hearing based on the gravity of his offenses of conviction in combination with his prior offenses. 461 F.3d at 1126. Relying on the decision in *Biggs*, the petitioner in *Sass* contended that reliance on these unchanging factors violated his right to due process. The court disagreed, concluding that in the case before it these factors amounted to "some evidence" to support the Board's determination. *Id.* at 1129. *Sass* explained its holding as follows:

> While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 917 (emphasis added). Under AEDPA it is not our function to speculate about how future parole hearings could proceed. Cf. id. The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision. Consequently, the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

461 F.3d at 1129.

Subsequently, in *Irons*, the Ninth Circuit sought to harmonize the holdings in *Biggs* and *Sass*, stating as follows:

> Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief.
>
> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*, *Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.
>
> Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both

13

> cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Irons*, 505 F.3d at 853-54 (citations omitted).

Most recently, in *Hayward*, the Ninth Circuit determined that under the "extraordinary circumstances" of that case, the unchanging factor of the gravity of the commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner's release would pose a continuing danger to society. *Hayward*, 512 F.3d at 546. The circumstances relied upon by the court to reach this conclusion in Hayward were the following: (1) the petitioner had served twenty-seven years in prison on a sentence of fifteen years to life; (2) the petitioner was sixty-four years old; (3) after eleven parole suitability hearings, the Board had twice recommended that the petitioner receive a parole date; (4) former California Governor Gray Davis reversed the Board's second grant of parole based on seven factors, four of which were unsupported by the record and three of which were based on unchanging circumstances; (5) the provocation for petitioner's crime was the attempted rape of his girlfriend (and future wife) by the victim; (6) the petitioner had solid parole plans, including several offers of employment and a place to live; and (7) the petitioner had an "exemplary" prison record for most of his period of incarceration, with his last major disciplinary violation taking place in 1989 and with only a minor disciplinary infraction in 1997. *Id.* Against this background, the Ninth Circuit explained:

> In light of the extraordinary circumstances of this case-given the provocation for Hayward's violent crime in 1978, his incarceration for almost thirty years with his positive prison record in recent times, and the favorable discretionary decisions of the Board in successive hearings, which were reversed by the Governor on factual premises most of which were not documented in the record-we conclude that the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole. In the circumstances of this case, the Governor violated Hayward's due process rights by relying on that stale and static factor in reversing his parole grant.

*Hayward*, 512 F.3d at 546.

///

14

1  ///

2        The recent decision in *Hayward* appears to be the first the first time that the Ninth Circuit has

3  applied the concern first articulated in *Biggs* to grant habeas corpus relief.  However, in so doing, the

4  Ninth Circuit carefully limited its holding to the particular facts of the case before it, stating:

> In concluding that Hayward's conviction offense does not, at this time, after nearly thirty years of incarceration, accurately predict that Hayward currently poses a danger to society, we do recognize that certain conviction offenses may be so "heinous, atrocious or cruel" that a prisoner's due process rights might not be violated if he or she were denied parole solely on the basis of the nature of the conviction offense. We need not identify those offenses here. We confine our holding to the facts of this case and the nature of Hayward's particular conviction offense.

10  *Hayward*, 512 F.3d at 547 n.10.

11        Taken collectively, *Biggs*, *Sass*, *Irons*, and *Hayward* do not establish any bright line rule in

12  Ninth Circuit jurisprudence, but suggest that relying solely on static factors to deny parole can

13  violate due process in certain extreme cases.  However, there is some question as to whether the

14  principle discussed in this line of Ninth Circuit cases – that relying solely on static pre-commitment

15  factors to deny parole can violate due process in certain extreme cases – has been clearly established

16  by holdings of the United States Supreme Court.  "Clearly established federal law", for purposes of

17  relief under AEDPA, only refers to the holdings, as opposed to dicta, of United States Supreme

18  Court decisions. *See Williams*, 529 U.S. at 412.[11]  Petitioner has not cited, and the Court has

19  identified in its own research, any Supreme Court decisions which find that even repeated reliance

20  upon unchanging pre-commitment factors by a state parole board in denying parole, derived from

21  application of relevant provisions of state law (which itself does not bar repeated reliance on such

22  factors[12]), demonstrates a violation of due process or, indeed, prevents such factors from serving as

---

[11] Although Ninth Circuit law may be used as "persuasive authority" for certain purposes, Ninth Circuit holdings without supporting United States Supreme Court precedent are not binding on the state courts. *See Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir.2004) ("We may not, of course, reverse a state court's decision simply because it is inconsistent with a rule established by a Ninth Circuit case.") (quotation and citation omitted); *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir.2000) ("Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.' ").

[12] The California Supreme Court has determined that, under California law, the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for

15

1  "some evidence" that parole should again be denied. The Ninth Circuit also recently observed, in a
2  post-*Irons* but pre-*Hayward* decision, that "[t]here is no 'clearly established federal law as
3  determined by the Supreme Court of the United States' that limits the number of times a parole board
4  may deny parole to a murderer based on the brutality and viciousness of the commitment offense."
5  *Culverson v. Davison*, 237 Fed.Appx. 174, 175 (9th Cir. June 8, 2007). "The dicta in Ninth Circuit
6  cases like [*Biggs*] are not holdings of the Supreme Court." *Id.* at at 175 n.1. However, in the recent
7  2008 *Hayward* decision, the Ninth Circuit appeared to regard the governor's reliance upon pre-
8  commitment factors, combined with other "extraordinary circumstances", to be an unreasonable
9  application of the "some evidence" standard established by the Supreme Court in *Hill*. *See*
10 *Hayward*, 512 F.3d at 548.

11         The Court need not resolve today whether this line of Ninth Circuit cases espouses a
12 principle clearly established by federal law, because even if it does, it would not warrant granting
13 habeas relief. The Court finds this case to be distinguishable from *Hayward* on the facts. Highly
14 significant to *Hayward*'s finding that the gravity of Hayward's commitment offense had no
15 predictive value regarding his suitability for parole were the "extraordinary circumstances" that the
16 petitioner was provocated to commit the crime by the attempted rape of his girlfriend (and future
17 wife) by the victim, and that after eleven parole suitability hearings, the Board had twice
18 recommended that the petitioner receive a parole date. *Hayward*, 512 F.3d at 546. On the record
19 here – which does not include such extraordinary circumstances – this Court is unable to conclude
20 that Petitioner's commitment offense and prior criminal history lack predictive value regarding his
21 suitability for parole in the same manner.

22         But for the fact that Petitioner has exceeded his minimum sentence, the circumstances
23 presented in the instant action are not materially distinguishable from those found not to warrant the
24 granting of a habeas petition in *Irons*, *Sass*, and *Biggs*. Here, petitioner argues he had received no
25 disciplinary infractions, had made commendable achievements in various self-help and vocational

---

27 the prisoner's release." *In re Dannenberg*, 34 Cal.4th 1061, 1071 (2005); *see also In re Rosenkrantz*, 29 Cal.4th 616 682-83
28 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

16

1 programs, and had viable release plans. The petitioner in *Irons* was "extremely industrious" in
2 prison, maintained "average to exceptional job performance in every position he ha[d] occupied,"
3 and "received certificates of completion in several vocational training programs." *See Irons*, 505
4 F.3d at 849. Likewise, in *Sass*, the petitioner displayed "exemplary conduct in prison," had
5 "detailed plans" for his release, received vocational training and certificates, and "had taken college
6 classes, for which he received all A's except for one B minus." *See Sass*, 461 F.3d at 1136 n. 16
7 (Reinhardt, dissenting). Similarly, the petitioner in *Biggs* was a "model inmate," received praise
8 from his supervisors for his "skills and efforts," received certification from the FAA in two aviation
9 programs, and earned Associate's, Bachelor's and Masters in Business Administration degrees. *See*
10 *Biggs*, 334 F.3d at 912. The Ninth Circuit nonetheless found the petitioners' accomplishments in
11 *Irons*, *Sass*, and *Biggs* insufficient to require a grant of parole. Accordingly, even assuming that the
12 *Biggs-Hayward* line of cases defined the parameters of clearly established federal law, this Court
13 could not conclude that the state court's ruling that the Board's denial of parole to Petitioner did not
14 violate due process was an unreasonable application of such federal law.[13]

15 In sum, in combination with the gravity of the commitment offense, petitioner's prior
16 criminal conduct comprised "some evidence" to support the Board's decision to deny parole.
17 Even wholly positive post-commitment factors do not preclude, under clearly established federal
18 law, a finding by the Board under California law that, nonetheless, a prisoner was unsuitable for
19 parole for reasons of public safety. The Superior Court's decision upholding the Board's denial was
20 not "contrary to" or an "unreasonable application of" clearly established federal law, or "an
21 unreasonable determination of the facts in light of the evidence presented" in the state court
22 proceedings. *See* 28 U.S.C. § 2254(d). Accordingly, the petition for a writ of a habeas corpus will
23 be denied.
24 ///
25

---

26 [13] Even assuming that the *Biggs-Hayward* line of cases defined the parameters of clearly established federal law, this Court also would not be inclined to consider the state court's application that law unreasonable given that the state court's
27 2004 decisions under review here occurred before *Sass*, *Irons*, or the Ninth Circuit's 2008 decision in *Hayward*, which was the first time the Ninth Circuit has applied the concern first articulated in *Biggs* to grant habeas corpus relief. This Court must
28 focus on whether the state court decision is an unreasonable application of "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders it decision." *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003).

17

///

**C.      Petitioner Did Not Receive a "Pro Forma" Adjudication From the Parole Board.**

Petitioner argues that he received a "pro forma" adjudication from the Board and, as such, the hearing did not comply with the requirements of due process.  However, the Supreme Court has held

 that a parole procedure complies with due process requirements of the Constitution if the Board affords an inmate: (1) an opportunity to be heard and; (2)  informs the inmate how he falls short of qualifying for parole, if parole is denied.  *Greenholz v. Inmates of Neb. Pen. & Corr. Complex*, 442 U.S. 1, 16 (1979).  This Court finds that Petitioner did not receive a "pro forma" adjudication from the Board because he had an opportunity to be heard, and the Board informed him as to how he fell short of qualifying for parole.

## CONCLUSION

For the foregoing reasons, Petitioner is not entitled to habeas relief on the grounds that the Board's denial of parole was a violation of his due process rights.  Accordingly, the Court **DENIES** the petition for a writ of habeas corpus.  A separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: March 21, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE